IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Milton Jones, Jr., Walter Davis and Angela Webb, | ) ) ) | Civil Action Number: |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| | ) | **(Jury Trial Demanded)** |
| CertusBank, N.A., Benjamin Weinger and 3-Sigma Value Financial Opportunities, L.P., | ) ) ) ) | |
| Defendants. | ) | |

## INTRODUCTION

Prior to their employment with CertusBank, N.A. (hereinafter referred to as "CertusBank"), Plaintiffs Milton Jones, Walter Davis and Angela Webb (collectively, "Plaintiffs"), each enjoyed long, successful careers as highly placed national bank executives. In 2010, they founded CertusBank, a new national bank that had a plan to buy the remains of failed or failing financial institutions and make them profitable. In just three short years, Plaintiffs grew CertusBank from four (4) to seven hundred (700) employees, launched banking operations in four southern states and amassed control of over $1.7 billion in assets. Plaintiffs, who all happen to be African American, built CertusBank into the largest minority founded and operated financial institution in American history. This action is about how one New York hedge fund mogul, Benjamin Weinger, and his organization, 3-Sigma Value Financial Opportunities, L.P. ("3-Sigma"), waged a campaign of misinformation and half-truths against the Plaintiffs to convince fellow investors and a majority of the CertusBank Board of Directors (hereinafter "Board") to remove the Plaintiffs from their jobs and destroy their business and personal reputations.

1

In founding CertusBank, the Plaintiffs combined their vast experiences to create a new bank out of the ashen remains of failed or failing financial institutions holding distressed assets after the recession of the early 2000's. Plaintiffs' business plan revolved around the framework of acquiring a base of distressed or failed banks or assets along the Interstate corridor from North Carolina to northern Florida and then growing CertusBank out from its base and into a national banking institution that would one day go public through a public offering.

However, before the Office of the Controller of Currency ("OCC") would issue a shelf charter for the creation of CertusBank, hearings were conducted before the Federal Deposit Insurance Corporation ("FDIC") to assuage concerns that the private equity investors of federally chartered banks not be permitted to gain or exercise control of the institutions. After the hearings, CertusBank became the first bank to receive a shelf charter after the passage of the Dodd Frank legislation. CertusBank's business plan was endorsed by many members of the United States Congress and certain Bank Regulatory authorities. Today, it is one of only a few banks in the United States which holds a shelf charter, enabling it to purchase assets in any state in the country.

In order to execute the Plaintiffs' vision of a new bank, CertusBank was initially capitalized by a commitment of $500 million in private equity through a small group of investors – investors who, in accordance with the hearings, were intended to be passive investors and who are restricted from "acting in concert" to influence the operation of the bank. Despite the control mechanisms that were designed to prevent such passive investor control, several rogue Board members conspired with at least one investor in order to oust the Plaintiffs from their positions, to co-opt the Board and to take control of CertusBank, in part, through the calculated public dissemination of defamatory statements about the Plaintiffs. These conspirators engaged

in a concerted effort to wrestle control of the company using underhanded tactics including, but not limited to: widespread marketing of lies and half-truths on a national scale to negatively depict the business practices and judgment of the founders, publishing inflammatory mistruths and illegally obtained internal customer information and preventing Plaintiffs from providing a factual and true defense to the allegations levied against them.

Specifically, as CertusBank navigated its way through the early successes and failures typical of startup banking institutions that purchase distressed businesses and assets, a power struggle emerged among CertusBank's Board of Directors and some of its investors. Some Board members, including most notably Doug Johnson, condoned the conduct and the allegations of Defendants Benjamin Weinger and 3-Sigma, a supposed "passive" investor of CertusBank. Weinger and 3-Sigma desired to change the management and Board composition of CertusBank and to position CertusBank as a target for acquisition because they did not receive a rapid return on their hedge fund investment. Weinger and 3-Sigma even went so far as to utilize internal bank and private customer information and other private documents and to execute the plan to seize control of CertusBank, all in violation of The Right to Financial Privacy Act 12 U.S.C. §3401, *et seq*. The actions of Weinger and 3-Sigma were secretly encouraged, condoned and applauded by certain CertusBank Board of Directors.

In order for Weinger's plan to be successful, the Plaintiff's authority to manage had to be rescinded and their reputations and credibility had to be publicly destroyed. Weinger and 3-Sigma set out on a public campaign to defame the Plaintiffs through the communications of half-truths and gross distortions which were rife with hateful racial remarks and heinous stereotypes about African Americans. Rather than correcting the false statements and condemning the racial undertone to Weinger's and 3-Sigma's complaints, CertusBank aided Weinger and 3-Sigma

3

through its passivity and tacit endorsement of the half-truths and distortions regarding CertusBank's financial condition and the alleged mismanagement and purported executive excesses of its leadership.

For example, CertusBank directed Plaintiffs to say nothing in rebuttal of these false allegations which damaged the bank and were refused to allow them to do anything to restore or defend their reputations. Instead, Plaintiffs were given 15 minutes to decide whether to resign their positions at the bank or be fired. The truth about the Board's actions, *ultra-vires* acts, breaches of their duties, self-dealing and other acts have been intentionally suppressed by the Board. Instead of acknowledging and addressing the short term fiscal issues which were inherent in CertusBank's plan to acquire failed institutions, the Defendants chose instead to capitalize on the opportunity to seize control of CertusBank through the public defamation and dismissal of the Plaintiffs.

For having been served up by certain actors as expendable, for having been forbidden from defending or restoring their good names and good reputations, as well as the reputation of the bank they had founded, and for having been publicly targeted without cause which has resulted in untold financial damage, the Plaintiffs seek justice in this action.

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Milton Jones, Jr. ("Jones") is a citizen and resident of the State of Georgia and is African American. At different relevant times herein, Jones was Chairman of the Board, President, Chief Executive Officer and Chief Financial Officer of CertusBank.

2.    Plaintiff Walter Davis ("Davis") is a citizen and resident of the State of South Carolina and is African American. At different relevant times herein, Davis was the Chief

Executive Officer, Co-Chief Executive Officer, Chief Credit Officer and Vice Chairman of CertusBank.

3.    Plaintiff Angela Webb ("Webb") is a citizen and resident of the State of North Carolina and is African American.  At different relevant times herein, Webb was the President, Sr. Executive Vice-President and Chief Administrative Officer of CertusBank.

4.    Defendant CertusBank N.A. is a Delaware corporation, a full-service, nationally chartered bank with a presence in twelve states and with its headquarters located in Greenville, South Carolina.  CertusBank is a subsidiary of CertusHoldings, Inc. (formerly Blue Ridge Holdings, Inc.), a corporation organized and existing in the state of Delaware.

5.    Upon information and belief, Defendant Benjamin Weinger ("Weinger") is a citizen and resident of New York who at all times relevant hereto was and is a 4.9% equity investor in CertusBank and worked in concert with some of the Board members of CertusBank to accomplish their plan of effecting a change in control of CertusBank.

6.    Upon information and belief, Defendant 3-Sigma Value Financial Opportunities, L.P. ("Sigma") is a Delaware limited partnership which is either owned, managed or controlled by Defendant Weinger.

7.    This Court has subject matter jurisdiction over this matter and the parties pursuant to 28 U.S.C. §1332 in that the amount in controversy is in excess of $75,000.00 and there is diversity of citizenship between the parties and many of the tortious acts which form the basis of this action occurred in South Carolina.

## FACTUAL BACKGROUND

8.      The financial crisis of 2007-08 is largely considered to be the worst financial crisis since the Great Depression of 1929 and is marked by the total collapse of some of the largest financial institutions in the world and the bailout of banks by national governments.

9.      The financial crisis in America led to a surplus of post-crisis banks and financial institutions which had either failed completely and/or which were on the brink of failure. Coupled with the surplus of distressed banks, there was also a shortage of experienced bankers who had the financial ability and/or experience to acquire or run these institutions, save jobs for the employees of these institutions and make them solvent.

10.     It is in this environment that the United States Office of the Comptroller of the Currency ("OCC") accepted applications for "shelf charters" which if granted would permit the grantee to participate as a purchaser in FDIC failed-bank auctions.

11.     It is out of this environment that CertusBank was born.

**The Team**

12.     Milton Jones was born and raised in Atlanta, Georgia.  Prior to joining the other Plaintiffs and becoming a founding member of CertusBank, Jones was employed by Bank of America for over 30 years where he held senior roles in finance, technology, banking and sales units and process improvement.  Jones began his career after graduating from Notre Dame in 1974, as a member of the audit staff of Peat Marwick Mitchell (now KPMG).  In 1977, he joined a predecessor of Bank of America and held a number of key finance positions over a 20 year span, including the roles of CFO for the General Bank (which comprised 2/3 of NationsBank) and Technology and Operations.  He became President of Dealer Financial Services in 1997 and turned the group around in less than a year to a level that exceeded its profit plan.  This group was the second largest "non-captive" provider of floor-plan and indirect financing in the nation.

From 1997 to 2001, Jones was a member of the 18 person Operating Committee, which developed strategy and focused on key decisions of the company. In 2002, the size of the committee was expanded and the focus changed, but Jones remained on the committee until he retired. In 1998 Jones became the leader of Technology Infrastructure worldwide for NationsBank and ultimately Bank of America through Y2K and the creation of the worldwide platform that the bank utilizes today. He then became the President of the MidSouth Banking Group, managing the banking operations in Georgia and Tennessee for Bank of America. He took this $15 billion organization from next to last in rankings within the Company to second place within 18 months. Jones later led the Quality and Productivity (six-sigma) organization for Bank of America for three years, reporting to the CEO Ken Lewis and led this group to produce more than $1 billion in revenue improvement and expense reduction for three consecutive years. In his last two years, Jones led the transformation of the CFO organization, served on a senior executive committee focused on U.S. Patriot Act compliance (BSA, AMI, Etc.), was the leader of Supply Chain Management worldwide and served as Georgia Market President

13.    Walter Davis is a native of Greenville, South Carolina. Davis began his banking career in 1987 with a predecessor of BB&T Bank in Greenville, South Carolina. Davis was recruited to join Bank of America's predecessor (NationsBank) in 1993 and eventually moved to its corporate home office in Charlotte, North Carolina, where he accepted a national position in the bank's Community Development Banking department. Davis eventually became responsible for the syndication of large real estate transactions for Bank of America. In 2005, Wachovia recruited Davis to join its bank. Prior to joining the Plaintiffs and ultimately founding CertusBank, Davis headed the retail credit unit for Wachovia Bank, was given total control over Wachovia's Golden West portfolio and was written about in the book "Banktown". While at

Wachovia, Davis was responsible for $70 Billion in bank assets and was tapped to co-lead and manage loss mitigation for the bank following the deterioration of the bank's $125 Billion Golden West portfolio. Davis has over 27 years in the banking business for national banks.

14.    Angela Webb was born and raised in Mocksville, North Carolina. She graduated from the University of North Carolina at Charlotte in 1985 and shortly thereafter joined Wachovia Bank. She enjoyed more than 20 years of employment from Wachovia Bank and its predecessor banks. During her career with the bank she served in many capacities from sales, collections, dealer and sales finance, underwriting, scorecard management, to running branches, and running a major portion of HR. The businesses within GBG HR included Mortgage and Retail Credit, consisted of: Sales, Operations, Servicing, Settlement Services, Default Management, Technology, Business Risk, Customer Experience, Community Lending and Pricing. She managed a team of professionals that supported more than 20,000 people in 39 states and three countries. She was persuaded by Davis to leave her position as the head of human resources for Wachovia Bank's mortgage unit to become a founder of CertusBank. Webb has over 25 years in the banking business for national banks.

15.    In addition to Jones, Davis and Webb, Charles Williams ("Williams") was the final founding member of CertusBank. Williams had served as the chief administrative officer of Bank of America's Global Capital Markets Division before joining the CertusBank team and also is African American. Williams was the former Co-CEO of CertusBank before his departure in early 2014. Together, Jones, Davis, Webb and Williams brought a combined 100 plus years of commercial, investment and retail banking experience at the highest levels to CertusBank.

**The Vision**

8

16.     These pioneers of CertusBank did not initially come together for the purpose of founding a new bank. Instead, their initial vision was to form an asset management group to purchase distressed properties from the portfolios of struggling financial institutions and to return the properties to profitability and/or to turn the properties for a gain.

17.     As the group approached equity investors for their new venture, a quality that impressed investors was the combined breadth and depth of the banking expertise which the group possessed.  Upon information and belief, what was more impressive to the investors, however, was the ability of the Plaintiffs to obtain something of immense value which was otherwise out of their reach – a shelf charter for a national bank.  In the post-financial crisis world, the investors knew that the likelihood of equity hedge fund managers being permitted to participate in the establishment of a new federally chartered bank under the existing political administration was somewhere between remote and impossible.

18.     Thus, it was actually a potential equity investor who first suggested to the group that they should instead seek the financial backing to start their own bank.  This suggestion was echoed by many US Congressional Senators and House members who served on their respective Bank and Financial Services Committees and several banking officials with the FDIC.

19.     Davis and Williams had long shared a vision of a new and progressive bank which would have the scope of services offered by the national big box banks coupled with the personal service of local community based banks.

20.     Following these meetings, the team shifted its vision away from the formation of an asset management firm to compete in the troubled assets market and toward the formation of a bank with a national footprint that would not simply acquire the distressed assets of other banking institutions, but would instead acquire, correct and operate the banks themselves.  Full

services of deposit, lending, investment advisory and mortgage services and relationships would be developed with the customers.

21.     With a strong leadership team in place, launching the vision of a new and progressive bank required two key components: a shelf charter from the OCC and funding.  It was the strength of the leadership team that made both of these components obtainable.

### The Climate

22.     In the wake of the financial crisis of 2007-2010, Congress enacted new legislation to promote the financial stability of the United States by improving accountability and transparency in the financial system, to end the "too big to fail" philosophy that had been a major contributing factor to the financial collapse and to protect consumers and restore consumer confidence in American banking.

23.     Most notable among the new legislation was the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which was signed into law on July 21, 2010.

24.     Introduction of Dodd-Frank significantly heightened the bar for the regulation of banking institutions and made the prospects of obtaining an OCC shelf registration all the more daunting.

25.     While the government and the banking industry certainly learned hard lessons through the financial crisis, so did investors, including in particular, investors with the wherewithal and the willingness to invest in new start up banks.

26.     The headwinds were strong as the Plaintiffs set out to put their vision of the new bank into play.  They knew that in order for the vision to come to fruition, not only would their

plan be highly scrutinized by both the government and the investors, so too would they be subject to a high level of personal scrutiny.

27.    Even so, the Plaintiffs knew that they had nothing to fear because they had both the experience, the industry relationships, ready personnel and the plan to make their vision work.

28.    As it turns out, the government and the investors agreed.

**The Beginning**

29.    CertusBank originally organized under Blue Ridge Holdings, Inc., a Delaware corporation ("Blue Ridge").

30.    In December, 2009, application was first made with the OCC by Blue Ridge for a shelf charter to operate a new bank.

31.    At the same time, the Plaintiffs were also invited to speak to equity investment groups about the opportunity to invest in their new bank.

32.    While the Plaintiffs met with entry level investors or small portfolio investors, the Plaintiffs focused primarily on the largest and most sophisticated equity investors in the country. The Plaintiffs were invited to meet with hedge fund investors, including Paulson Management II ("Paulson") (founded by billionaire John Paulson), Tricadia Capital Management ("Tricadia"), BlueMountain Capital Management ("Blue Mountain"), King Street Capital Management ("King Street"), and 3 Sigma, groups that managed and invested billions of dollars.

33.    As the OCC and the FDIC were conducting their due diligence on Blue Ridge, including a request by the FDIC for input and information from Davis in Washington, D.C., the investor group was likewise doing its research on both the Blue Ridge leadership and their plan.

34.    Both the government and the investors were well satisfied with what they learned about Blue Ridge and the Plaintiffs.

35.    Within six months of seeking application for its shelf charter with the OCC, Blue Ridge (later after a name change CertusBank[1]) had received commitments for up to $500 million of equity investment from a small group of investors including Paulson, Tricadia, BlueMountain and King Street, and had also received conditional approval of its application for a shelf charter.

36.    In fact, CertusBank became the first post Dodd-Frank banking institution to be granted a shelf charter and remains as one of only a few such institutions in operation today.

37.    As a part of CertusBank's shelf charter application process, the OCC and FDIC explored the wisdom of permitting a new shelf chartered bank to be backed by private equity funding.  It was concerned in part that the independence of the bank may be compromised if outside investment were allowed to exert control over the institution by virtue of its investment.

38.    As a result, the government placed restrictions on the investors who were permitted to provide the equity capital backing of CertusBank.

39.    Significantly, the investors were each restricted in the level of their investment with no single investor being permitted to contribute more than 9.9% of the voting shares and they were restricted in that they were expressly prohibited from "acting in concert" with one another to influence the operation of the bank.

40.    The investors, including Weinger, understood these restrictions at the time they agreed to back CertusBank to the tune of $500 million.

41.    Full shelf charter status was to be granted to CertusBank upon its first acquisition of a financial institution at which time CertusBank would be born.

---

[1] Certus is Latin meaning certain.

12

42.    CertusBank agreed to maintain a 10% Tier1 leverage ratio.  CertusBank also had to satisfy regulators with a sufficient CAMELs rating that would allow it to continue its M&A activity.  A CAMELs rating is a measure of the financial health of a bank based upon the bank's capital adequacy, assets, management capability, earnings, liquidity and sensitivity to market risk.  The CAMELs rating as a new bank would be the envy of the industry.

43.    As key employees of Blue Ridge (and later CertusBank), each of the Plaintiffs were highly compensated executive officers who enjoyed and deserved significant annual compensation, benefits and stock options as founding members pursuant to written employment agreements that were well known and approved by the Board and investors.

44.    The CertusBank Board of Directors ("Board") consisted of eight (8) members. Three of the Board members were insiders: Davis, Jones and Williams, with Jones being Chairman of the Board.

45.    The remaining five (5) members were outsiders, most of whom had no executive banking experience in their backgrounds but were experienced in business or academia.

46.    In addition to Davis, Jones and Williams, the other five members of the Board were Doug Johnson (current chair for the Audit Committee for Aflac), Hildy Teegen (former dean of the USC Darla Moore School of Business), Veronica Biggins (board member for Southwest Airlines), Bob Brown and Bob Wright (former lead independent director for Aflac).

47.    While all Board members are also shareholders, Hildy Teegen and Bob Brown only hold the minimum share requirement of 50 each.

48.    While the Plaintiffs have been unfairly characterized for alleged executive abuses, the Board members themselves have abused their fiduciary positions and have used their Board powers to cause CertusBank to spend money to advance their own interests or agendas.

Examples include but are not limited to: the Compensation Committee requested the issuance of $1 million worth of founder's stock options for themselves,  but settled instead for one-time option grants of $100,000.00 each, without informing the rest of the Board; pushing CertusBank to commit to donate $1.8 million to the USC Darla Moore School of Business without the full Board knowing and while the requesting Board member was Dean of the School of Business; experiencing disqualifying events that should have led to their immediate Board dismissal, but which instead were ignored; pushing CertusBank to be a sponsor of the annual Bob Wright Golf Tournament; practically forcing the hiring of friends and close relations to bank positions with limited employment purpose; and causing a "change of control" of the bank to occur when a special committee of all five independent Board members (headed by Doug Johnson) took control of the Board, limited the authority of the Plaintiffs and other executive officers and negated CertusBank from operating under an eight (8) person Board.

### Growing a Bank

49.     On January 21, 2011, CertusBank acquired Community South Bank, a failing bank outside of Greenville, South Carolina, through an FDIC auction.

50.     Consistent with its plan, CertusBank accessed some of its investor funding to make the purchase and also received funding through the FDIC, which in essence paid CertusBank to take on the failing institution.

51.     Through the acquisition of Community South Bank, CertusBank acquired roughly $450 million in assets while tapping very little of its available equity investment fund.

52.     In 2011, CertusBank purchased two more failing banks in Georgia, bringing its total assets under management to approximately $1.8 billion and its total branches to 30 while only utilizing $218 million of its available $500 million in equity investment.

53.    CertusBank purchased six (6) more companies without making any additional calls of capital.  CertusBank was able to purchase these companies using the available capital from the approximate $62 million of net profit made in 2011.

54.    These purchases included two (2) mortgage operations, a national SBA lender, a broker-dealer and a 35% interest in a wealth advisory business.

55.    In the process, CertusBank only accessed a total of approximately $218 million of its $500 million committed capital.

56.    The decision was made to locate CertusBank's headquarters from Charlotte, North Carolina to Greenville, South Carolina for a host of reasons, including its central location along the I-85 corridor and the vibrant Greenville economy.  Additionally, the relocation to Greenville was encouraged by the State of South Carolina, which committed $20 million of tax credits.  The Greenville location also allowed CertusBank to grow without being forced to compete with Bank of America, Wells Fargo and a host of other banks and financial institutions located in the Charlotte, NC landscape.

57.    Given the rapid growth, number of employees, unique stature and position of the bank, a collective decision was made by the Board and the executive officers to construct a home office in the prominent central business district of Greenville, SC that would rival the home offices of the other national banks in Charlotte, NC.

58.    Given the nature of the distressed assets being acquired by CertusBank, it was anticipated that its early years would be tumultuous and that it would probably experience several years of losses from liquidating non-performing assets that were acquired, the impact of building a technology, risk and compliance infrastructure suitable for a $5 billion bank that was directed by its regulators, and from accounting and tax impact of loss-share accounting and

FDIC reimbursements before being able to grow a sufficient footprint to absorb the bad loans and underperforming assets which were on the books and records of the institutions which CertusBank was acquiring.

59.    The Board and the investors fully anticipated years of financial struggle before long term stability and profitability could be achieved, although it now is apparent that some of the investors, including 3-Sigma, had  quickly developed "impatient capital" notwithstanding being told of the longer term investment strategy.

60.    Incredibly, CertusBank actually reported net income during its first full year of operation of approximately $62 million.

61.    The Board could not have been more effusive in the praise of the Plaintiffs and rewarded them with performance bonuses in excess of $500,000.00 each.

62.    Within eighteen months after the acquisition of its SBA business, CertusBank became the 17th largest of 2,500 SBA lenders in the Country and the number one SBA lender in South Carolina.

63.    While the early gains were certainly good news for both the bank and its investors, the Plaintiffs regularly communicated to the Board beginning in early 2012 that significant losses were on the horizon and that it was not practical to expect that CertusBank could grow from its inception on a steady diet of failed banks and not experience accounting and operational losses in the many millions of dollars along the way.

64.    In retrospect, it appears that the early successes bred unrealistic expectations from CertusBank's investors and others who were happy to revel in the good times, but who proved impatient and unsteady as the anticipated corrections came home.

65. Moreover, the early successes were detrimental to the true desire of Defendant Weinger and others to seize control of CertusBank away from its founders.

66. While the investors had been cautioned that their involvement in CertusBank was to be passive, those admonitions quickly fell to the wayside as the investors sought to exercise control or influence over the Board and as every move of the Plaintiffs was monitored and hawked.

**Necessary Expenditures**

67. It was the vision of CertusBank that it would position itself as a national bank, a modern bank and a progressive bank. This was the vision of the Plaintiffs and Williams as its founders. This was the vision that so captured the investors that they almost instantly agreed to capitalize the bank with $500 million.

68. It was not the vision of CertusBank to be positioned or perceived as a local savings and loan or a community bank which would merely make small consumer and business loans and take deposits from its customers.

69. CertusBank was created to compete with Bank of America, TD Bank, SunTrust and Wells Fargo.

70. Creating a bank with a national presence and national appeal requires time, money, promotion, sacrifice and visibility at public events.

71. Jones, Davis, Webb and Williams spent the time and made the necessary personal sacrifices.

72. For nearly a year and a half, they commuted from Atlanta and Charlotte to Greenville, South Carolina (and elsewhere) living separate and apart from their families in hotel

rooms often times for six nights a week, while personally maintaining the financial burdens of their homes in Charlotte, NC.

73.     Eventually, it made better sense that CertusBank acquire living spaces in Greenville, South Carolina for its leadership, rather than incur the time and expense of travel between Greenville and their home cities, to require that CertusBank incur the expense of hotel stays or to have CertusBank incur the expense of executive relocation through the liquidation of the Plaintiffs' homes in Charlotte and Atlanta which would have cost CertusBank millions of dollars.  In addition, it was important for the executives, especially Davis and Webb, to be viewed as residents of Greenville for purposes of building banking relationships, brand strength and market share in Greenville.

74.     To that end, CertusBank became the titled owner of three apartments in downtown Greenville, South Carolina and in close proximity to CertusBank's new headquarters to be utilized by its three executives, Davis, Williams and Webb.  It was anticipated that living arrangements and/or relocation of the executive team would be necessary.

75.     The apartments, which served as both residences and locations for customer interaction, were reasonably up-fitted and furnished.  At all times, the apartments were and remain the exclusive property of CertusBank, one of which generated profit for CertusBank.

76.     As the Plaintiffs and other members of the CertusBank team reviewed potential banks across the Southeast and/or met with investors, government officials or potential partners in the Southeast and beyond, they often used air travel and from time to time the travel was by private charter when it proved more convenient and/or cost effective.  Board member Bob Wright actually encouraged Davis and Webb to travel by charter planes and to purchase a Net Jet card because "their time was too valuable to the bank" to be wasted through travel by car across

the back roads of Georgia and South Carolina at late night and early morning hours to traverse the far-flung locations of the CertusBank's branch network.

77.     CertusBank did not buy airplanes.

78.     To advance its image as a modern, progressive and national bank, CertusBank furnished seven (7) floors of a flagship downtown central business district office in a reasonable manner using design and construction practices that were not excessive.  Money invested on artwork and technology, as capitalized assets was highly successful in branding its image of a new and modern bank in downtown Greenville, South Carolina.

79.     CertusBank did not expend excessive funds branding its image and creating a framework in which it could foreseeably compete on a national level, especially in comparison to its competitors.

80.     The goal of branding and promoting CertusBank was so central to the growth and success of the Bank that the Plaintiffs were expressly granted authority by the Board to expend up to $2 million per occurrence without seeking Board approval for anything that was CertusBank related or would advance the image of CertusBank.

81.     The construction, upfit and FF&E for the Greenville, SC main office was approved by the Board as a part of CertusBank's annual budget.

82.     If the Board disagreed with the budgeted amounts it had the opportunity to criticize, demand reductions or modifications to the budget and the individual items, but failed to do so time and time again.  That is, it failed to do so until such time as a justification for the summary termination of the Plaintiffs became necessary.  Since that time, a great deal has been said about the spending of the Plaintiffs, much of which is true and all of which was purposefully misleading and out of context.

83.    It is true that under the Plaintiffs' leadership, CertusBank spent money on Carolina Panthers tickets and a suite to entertain its customers, to attract new business partners and to project its image publicly.  It is likewise true, that the pennies spent by CertusBank paled in comparison to the money spent by other banks in the Bank of America Stadium.

84.    It is true that money was spent on PGA tour events and for political events.  It is also true, however, that the expenditures were made with Board knowledge.

85.    Nevertheless, Defendant Weinger (and perhaps others) used these issues later as the seeds of discontent which would grow into full blown mutiny when impatient investors acted in concert together with certain Board members to pressure the remaining malleable CertusBank Board members to turn like jackals on the Plaintiffs and blame them when the increased losses associated with buying failed banks had to be recognized at the end of 2013.

86.     Something had to create the opportunity to parlay the anticipated losses into a method of seizing control of CertusBank.  To further the plan, someone had to be expendable.

**A Change in Control**

87.    In 2013, the anticipated losses which had little to do with the operational aspects of CertusBank and much to do with the nature of the assets which it had acquired finally began to appear on the records and accounts of CertusBank.  The losses were used as part of a conspiracy to wrestle control of the bank.

88.    Rather than address the issues responsibly and report accurately how the losses had been incurred and reported, Weinger, 3-Sigma (and perhaps others) used the opportunity of the losses coupled with a dossier of the alleged abuses and excesses of the Plaintiffs to put a power play into motion.

89.    Upon information and belief, through the influence or insistence of Weinger and 3-Sigma (and perhaps others), the independent members of the Board commissioned themselves as a Special Committee of five Board members to investigate the Plaintiffs, secretly hired independent counsel, removed the Plaintiffs' and others executive authority and usurped the power of the eight (8) person Board, all of which constituted a change of control of CertusBank and caused certain financial rights of the Plaintiffs under their compensation formulas to vest while at the same time causing regulatory implications.

90.    Curiously, the empowerment of the Ad Hoc Committee and the divestiture of the Plaintiffs' authority also overlapped in time with the foiled acquisition of an institution in the Southeastern United States.

91.    When the opportunity was first presented to CertusBank, it was the opportunity for CertusBank to act as the acquiring institution.  As the due diligence progressed, however, the structure of the deal eventually shifted to a de facto acquisition of CertusBank by the to-be-acquired institution.

92.    Upon realizing that the nature of the transaction had changed materially, Davis lobbied the Board successfully to reject the transaction.  Upon information and belief, Weinger (and perhaps others) wanted to see the transaction fail as the capital issuance required would dilute existing shareholders.

93.    Around this time, Weinger and 3-Sigma curiously came in possession of highly confidential inside Bank information and documents, including income tax returns and audited financial statements of Integrated Capital Strategies, LLC ("ICS") that were not available to other investors, or the public and other confidential and federally protected bank customer information of such customers as the 100 Black Men of Atlanta, Georgia, CW Williams of

Charlotte, N.C. and potentially untold others. In violation of banking secrecy regulations on the two named customers above, the information was released publicly.

**Weinger's and 3-Sigma's World**

94. On January 6, 2014, Weinger and 3-Sigma sent a letter to "The Stakeholders of CertusHoldings, Inc." (attached hereto as **Exhibit "A"**) in which he disparages Plaintiffs' management, accuses Plaintiffs' of wasting the Bank's resources, and advocates the sale of the Bank. Weinger concludes his letter, in part, with the racially-charged exclamation that, "THE SHIP BE SINKING!"

95. On March 5, 2014, Weinger and 3-Sigma published another letter to the "Stakeholders of CertusHoldings, Inc." (attached hereto as **Exhibit "B"**) which contained false and libelous statements about the Plaintiffs, made outrageous and uncivilized racial statements about the Plaintiffs (as well as the African American race) and contained other damaging statements all with the malicious intent and improper purpose to accomplish his goal of ousting the Plaintiffs from their positions in CertusBank and seizing control of Certus for the investors, who like him now had "impatient capital" and wanted a rapid return on it.

96. The March 5, 2014, libelous letter was sent to all of the investors of CertusBank and, upon information and belief, was provided to the media. Weinger and 3-Sigma had specific knowledge of the Plaintiffs' written employment agreements and other confidential bank, customer and ICS information that was unlawfully provided to Weinger and 3-Sigma. Weinger and 3-Sigma acted with a specific intent to interfere tortiously with the agreements by causing CertusBank to terminate the Plaintiffs without having to pay them the future compensation and other financial benefits to which they were entitled. Weinger's actions to interfere with these

written agreements were for improper purpose, malicious motive and with expressed desire that Plaintiffs' employment with the bank be terminated.

97.    The Weinger/3-Sigma March 5, 2014 letter, which was replete with negative racial overtones and innuendo, was apparently designed to be marketed to a national publication to create a humiliating image of the Plaintiffs as African American spendthrifts and set the stage for the Board to conspire and act in a collusive manner, which was most apparent when the Plaintiffs were denied the right to defend themselves.  Weinger's letters and the comments he made in a meeting the day one of his letters was sent included a number of negative African American stereotypes, such as:

    a.  Change We Can Believe In.

    b.  The ship be sinking.

    c.  They gots to go.

    d.  Playing the race card is a sign of failure.

98.    Weinger and 3-Sigma went so far in their letters and statements to impugn the business character of the Plaintiffs and to accuse them of criminal conduct, all of which constitutes libel *per se.* The letter threatened that the Plaintiffs resign "**OR BE FIRED UNDER THE HARD LIMELIGHT OF THE MEDIA.**" (Emphasis in original).  The letter concludes by urging CertusBank's equity investors to join Weinger and 3-Sigma at a town hall meeting for the express purpose of sacking the Board of Directors.

99.    The statements contained in the Weinger/3-Sigma letters are morally repugnant in that they employed racist and racially charged language in an apparent effort to engender animosity toward or fear of the Plaintiffs solely on account of their skin color.  For example, the

March 5, 2014 includes one section entitled, "Change We Can Believe In" as an apparent mocking reference to the Nation's first African-American President.

100.    Not only did CertusBank fail and refuse to address or rebut the Weinger indictment, it also muzzled the Plaintiffs from being able to provide any response of their own to refute the Weinger accusations or to provide proper context in defense of their good names and good reputations.    As such, the Board aided and abetted Weinger and 3-Sigma in the dissemination and publication of these falsehoods and permitted them to remain unchallenged and unrebutted which caused significant and continuing damage to the Plaintiffs.

101.    In furtherance of their fiduciary duties and to protect their reputations and to temper the very public character assassination which had occurred throughout the national banking industry, the Plaintiffs' and CertusBank's public relations firm prepared strong statements and supporting documents which refuted the falsehoods published by Weinger.

102.    This response included:

a.    Proof of Board knowledge of the expenditures which were questioned by Weinger;

b.    Proof that the services and compensation provided by and to ICS had been reviewed without objection by independent accountants and OCC regulators

c.    A strong press release that the Plaintiffs and CertusBank's PR firm requested the Board to release and which request was refused.    A copy of the response is attached hereto as **Exhibit "C".**

d.    A strong written response from the Bank's esteemed attorneys at Hunton & Williams advising Weinger of his legal liability for his actions.

24

103.    Finally, in an attempt to remind the Board of its prior approval of many of the questioned expenditures and to correct other falsehoods, the Plaintiffs prepared a presentation and supporting documents that it wanted to be presented to the Board and to be released to the media and the banking publications that were publishing articles concerning Weinger's public campaign of slander and libel of the Plaintiffs.

104.    By way of example, Weinger falsely accused the Plaintiffs of purchasing over $5,000.00 of Steve Madden shoes.  He was wrong and reckless in his accusations.  The Steve Madden who received support from CertusBank was an employee who suffered a tragic ATV accident, not a shoe magnate.  CertusBank had authorized the expenditure of money to widen doorways in his home to accommodate his wheelchair in order to assist him in his paralysis. Instead, the public was left to believe that the leadership of CertusBank had purchased over $5,000.00 of Steven Madden shoes.  A copy of the complete presentation is attached hereto as **Exhibit "D"** [2].

105.    By way of further example, CertusBank did not have a main corporate credit card and Webb put many of the charges for travel, entertainment and supply purchases by many of the bank employees on her credit card.  As a result, the total purchase balance on her credit card was over $500,000.00.   Weinger's accusation of excessive credit card spending was easily explainable, but the Board showed no interest in correcting the public mischaracterization.

106.    As perhaps a final insult,  the Plaintiffs, as African Americans and with the bank being nationally known as having been founded by African Americans, took severe umbrage at Weinger's racist inferences and remarks in his public campaign he was waging and requested that the Board respond forcefully, especially given that CertusBank has prominent African

---

[2] Exhibit D has been redacted to protect any potentially confidential or sensitive financial information regarding CertusBank and/or its customers.

American organizations as customers, many prominent African American individual customers, African American employees besides the Plaintiffs, African American Board members other than Williams, Davis and Jones and that the President of the United States is African American.

107.    The Plaintiffs advised the Board and warned the Board that there were many black organizations and religious groups who were outraged by Weinger's insulting comments and demanded that the bank respond forcefully to them.

108.    Again, the Board not only refused to issue a response, they directed the Plaintiffs to be silent.

109.    Even when the Plaintiffs reminded the Board that it had at legal duties under the Federal Right to Financial Privacy Act to investigate where the leaks from the Board to Weinger which provided him with confidential bank information about the finances of CertusBank, Board decisions and non-public customer information originated, the Board was not interested.

**The Chief level Executive Officers are Expendable**

110.    After the late 2013 losses hit the books of CertusBank and its Tier1 capital ratio dropped below 10%, the Plaintiffs developed a detailed revised budget for 2014 and a plan to restore the Tier1 capital ratio above the regulatory required level, which were submitted to the regulators and to the Board for review and approval on March 31, 2014.  The process was also underway to develop a revised Comprehensive Business Plan to refine the blueprint for restoring the Tier1 capital ratio and sustaining earnings improvement over time.  The plan would have restored the bank's Tier1 capital ratio within three to six months, and execution of the plan and other improvements were designed to improve the CAMELs rating without long term dilution of the investor's shares.   This plan was discussed with the regulators verbally shortly after

26

submission and discussed further with them when they attended a Board meeting within a week after the Plaintiffs' termination.

111.    Amazingly, the Board was not interested.  The reason for the lack of interest was self-motivated.  The plan required the closure of several non-performing branches which were located in the back yards of some of the bank's directors.  Bob Wright and Doug Johnson, two of the most vocal members of the Board on this subject, who also abused their positions the most, were adamant that such not occur.

112.    It was obvious to the Plaintiffs at this point that the Board was not interested in CertusBank becoming a profitable bank.  Rather, it wanted the continued bad press so that the Plaintiffs could be ousted and the control of CertusBank could be wrestled away from the Plaintiffs.

113.    On March 28, 2014, a meeting of the Board of Directors was called for the purported purpose of providing the Plaintiffs with an opportunity to address and respond to the allegations contained in the Weinger/3-Sigma letters.  The meeting was a charade.  Instead of creating a forum for a meaningful exchange of information in order to formulate a responsible way to address the Weinger/3-Sigma letters, the Board opted instead to avoid completely the subject of the Weinger/3-Sigma letters and to discuss budgetary items.  During the meeting, the Board also went into executive session to the exclusion of the Plaintiffs.

114.    On April 9, 2014, the Plaintiffs were terminated from their employment without cause.  Prior to their termination, they were given 15 minutes to make their "choice" of being fired or resigning their positions.  In reality, their replacement was in downtown Greenville and already possessed business cards indicating his new position as Interim President.  Upon

information and belief, he was just waiting for the phone call to confirm that the deed had been done.

115.    The aforementioned torts have permanently damaged the business and personal reputations of the Plaintiffs and proximately caused damages to them in the many millions of dollars.

**For a First Cause of Action as Against Defendants Weinger and 3-Sigma**

**Libel and Defamation *Per Se***

116.    All paragraphs set forth hereinabove are incorporated herein as if realleged and restated in full verbatim.

117.    On or about March 5, 2014, Defendants Weinger and 3-Sigma sent a letter to "The Stakeholders of CertusHoldings, Inc.", a copy of which is attached as **Exhibit "A"**.

118.     This letter was published and sent to the investors of CertusBank and perhaps others.  The letter consisted of twenty-five pages of accusations, insinuations, half truths and outright lies.  By way of example and not limitation, the letter contained all of the following statements:

a.    "Over the past two years, more than $100 Million of equity capital has been erased in the most baseless and irresponsible way – by spending exorbitantly on personal excess masked as corporate expense."

b.    "Given that the Company is currently in violation of its [SEC] registration requirement, shareholders must immediately come together for a Special Election Meeting. The Trigger Date was the day the Company breached, and the fact that this information has not been disclosed to shareholders is a basis for fraud – either gross negligence (best case) or deliberate fraud (worst case)."

c.    "After discussing this issue with various investors in recent weeks, I now see this bait and switch as a duplicitous act. . . .  Management can hire high-priced lawyers on our dime to argue against our rights . . . ."

d.    "More money wasted so that the Board can cling to its paychecks and tarnished legacy for a few extra months."

e.    "When the inevitable post mortem is conducted and this debacle is sprayed across the cover of the Wall Street Journal, the CertusHoldings Board of Directors might escape attribution if they listen to the shareholders before it's too late."

f.    "ICS reported $1,112,809 and $762,953 of net income in 2011 and 2012 respectively. This proves Milton [Jones, Jr.] has been lying to me since the first time the acronym ICS was uttered in my office in 2011."

g.    "The level of overbilling by ICS is at best egregious and possibly criminal."

h.    "American Express cards used by Milton, Walter, Charlie, and Angela = $368,780 in 2012 alone, equal to $30,000 per month.  I unfortunately can imagine the personal expenditures being charged to the bank, and if the auditors do not assess the validity of these expenses then they are negligent."

i.    "In addition to the $30 million of tenant improvements spent on CertusBank's new headquarters, management spent over $2.5 million on three condos and related [Furniture, Fixtures & Equipment]. The $2.5 million in Greenville is equivalent to tens of millions in New York and the extravagance rivals that of Dennis Kozlowski. For those who don't remember the details, Dennis Kozlowski (the Koz) was the CEO of Tyco International and who went to prison for misappropriating millions of dollars by having Tyco pay for his extravagant

lifestyle including a $30 million New York apartment furnished with opulence that included $6,000 shower curtains and a $15,000 dog umbrella shade…..  Angela Webb is directly responsible for all this ridiculous spending.  However, the spree was approved by the others and therefore all four senior executives are culpable."

       j.     The letter accused Williams and Plaintiff Davis of having stolen cars from CertusBank.

       k.     "Management just repeats the same broken promises.  These are just words with no meaning, repeated again to render them even less meaningful."

       l.     "More than $1 million was loaned to 100 Black Men of Atlanta, of which Milton was Chairman at the time of CertusBank's formation.  The loan is now classified.  We are told that Milton forced through the loan in good standing despite objections by the Bank's internal underwriters."

       m.     "Wow.  The Race Card.  Played in real life.  Maybe we should back off now?  Do we let them continue wasting our money because they point out the obvious?  The stereotypes are horrible but unfortunately in this case they are true."

119.    To the extent that Defendants statements accuse the Plaintiffs of having committed crimes, they constitute defamation and libel *per se*.

120.    To the extent that Defendants statements accuse the Plaintiffs of being unfit in their trade and profession, they constitute defamation and libel *per se*.

121.    Defendants' statements have been republished in whole or in part, including republication through trade magazines and media.

122.    Defendants are liable to the Plaintiffs not only for the initial publication of their libelous and defamatory statements, but also for each subsequent republication as separate offenses and separate causes of action.

123.    Defendants published their libelous and defamatory statements with malice.

124.    Defendants published their libelous and defamatory statements with knowledge that they were either false, misleading or out of context.

125.    As a result of Defendants' statements, the Plaintiffs have been harmed both in the loss of income and benefits associated with their employment, as well as in their ability to obtain similar employment in the future as a result of the irreparable harm that has been suffered to their good reputations and standing in the community.

126.    Plaintiffs are entitled to and pray for an award of damages against Defendants Weinger and 3-Sigma for actual damages for each and every publication and republication of the false, libelous and defamatory comments made about them, together with an award of punitive damages in an amount determined by a jury to be sufficient to impress upon the Defendants the seriousness of their conduct and to deter such similar conduct in the future.

**For a Second Cause of Action as Against Defendant Weinger**

**Tortious Interference with Contractual Rights**

127.    All paragraphs set forth hereinabove are incorporated herein as if realleged and restated in full verbatim.

128.    Defendant Weinger had specific knowledge of the Employment Agreements which each of the Plaintiffs had with CertusBank.

129.    Defendant Weinger acted with a specific intent to procure a breach of the Plaintiffs' Agreements and to deprive the Plaintiffs of the economic benefits of such Agreements.

130.    Defendant Weinger acted willfully and without justification.

131.    As a direct and proximate result of Weinger's conduct, the Plaintiffs' Employment Agreements with CertusBank were terminated.

132.    As a further direct and proximate result of Weinger's conduct, the Plaintiffs have suffered the loss of the economic benefit of such Agreements, including but not limited to the loss of several pay and other severance rights.

133.    The Plaintiffs are entitled to and pray for an award of damages against the Defendant herein both for actual damages, in an amount necessary to compensate the Plaintiffs fully for all losses occasioned herein, and punitive damages, in an amount deemed sufficient by a jury to compensate the Plaintiffs to impress upon the Defendant the seriousness of his conduct and to deter such similar conduct in the future.

**For a Third Cause of Action as Against Defendant Weinger**

**Tortious Interference with Prospective Economic Advantage**

134.    All paragraphs set forth hereinabove are incorporated herein as if realleged and restated in full verbatim.

135.    Prior to the events set forth herein, the Plaintiffs each enjoyed stellar careers and reputations within the banking industry.

136.    Based upon their well-deserved and hard-earned reputations, the Plaintiffs had highly marketable skills within the banking industry which would have assured them continued employment, flexibility and mobility in the future.

137.    Through his campaign to oust the Plaintiffs from CertusBank and to wrestle control of the bank into the hands of its investors, the Plaintiffs' reputations have been forever marred and so too has their ability to earn income in the future and to enjoy the fruits of their well-deserved reputations been compromised.

138.    The Defendant, by and through his conduct, has tortiously interfered with the Plaintiffs' prospective economic advantage.

139.    The Plaintiffs are entitled to and pray for an award of damages against the Defendant herein both for actual damages, in an amount necessary to compensate the Plaintiffs fully for all losses occasioned herein, and punitive damages, in an amount deemed sufficient by a jury to compensate the Plaintiffs to impress upon the Defendant the seriousness of his conduct and to deter such similar conduct in the future.

## For a Fourth Cause of Action as Against CertusBank

## Libel and Defamation *Per Se*

140.    All paragraphs set forth hereinabove are incorporated herein as if realleged and restated in full verbatim.

141.    Following the publication of the Weinger letter (which is attached hereto as **Exhibit A**), and particularly after the republication of much of the letter through the media, the Plaintiffs desired to issue a response to the false, defamatory and libelous statements.

142.    To that end, the Plaintiffs and CertusBank engaged the services of a PR firm to help develop a press release to address Weinger's false accusations and to place them into proper context.

143.    Although a response was available and although CertusBank understood that the failure to respond would be detrimental to CertusBank, the Plaintiffs were forbidden from issuing any response to any of the allegations made against them.

144.    Instead, the Plaintiffs were publicly and summarily fired from their positions.

145.    News of the public firing was immediately released by CertusBank, which by implication communicated that the false, defamatory and libelous statements first published by Weinger were in fact true and were endorsed, ratified and condoned by CertusBank.

146.    Incredibly, immediately after firing the Plaintiffs and hiring a new interim President, CertusBank's new President confirmed publicly that there was "nothing fundamentally flawed with the business model of CertusBank."

147.    As a result of Defendant CertusBank's endorsement, ratification and condonation of the libelous Weinger publication, the Plaintiffs have been harmed both in the loss of income and benefits associated with their employment, as well as in their ability to obtain similar employment in the future as a result of the irreparable harm that has been suffered to their good reputations and standing in the community.

148.    Plaintiffs are entitled to and pray for an award of damages against Defendant CertusBank for actual damages for each and every publication and republication of the false, libelous and defamatory comments made about them, together with an award of punitive damages in an amount determined by a jury to be sufficient to impress upon the Defendant the seriousness of its conduct and to deter such similar conduct in the future.

34

**For a Fifth Cause of Action as Against All Defendants**

**Civil Conspiracy**

149.    All paragraphs set forth hereinabove are incorporated herein as if realleged and restated in full verbatim.

150.    Defendants Weinger, 3-Sigma, CertusBank and others, came together for the purpose of inflicting special harm on the Plaintiffs.  The acts of the Defendants and others in furtherance of the conspiracy include, but are not necessarily limited to some or all of the following:

a.    Someone other than the Plaintiffs released confidential bank and financial information about customers of CertusBank to Defendants Weinger and 3-Sigma for their use in preparing a letter which was to be used in an effort to defame the Plaintiffs and to cause the termination of their employment;

b.    When the Plaintiffs became aware of the release of confidential bank and financial information about customers of CertusBank, they urged the board of directors to take action to determine the source of the leak of the information in board meetings on March 28th and again on April 8th, but the Board refused to take any such action;

c.    Someone other than the Plaintiffs provided a copy of the Weinger/3-Sigma letter dated March 5, 2014 to the media which resulted in articles being published which depicted the Plaintiffs in an unfair light;

d.    After the Plaintiffs were the recipients of negative press through the republication of the Weinger/3-Sigma letter, the Plaintiffs urged CertusBank and its board of directors to issue a public statement of fact addressing the false and one-sided allegations which

35

had been levied against them, but the Plaintiffs were forbidden from saying anything in response and in defense of their conduct and their good reputations.

151.    Defendants Weinger, 3-Sigma, CertusBank and others did in fact cause special harm on the Plaintiffs in a number of particulars, including most importantly that the Plaintiffs were once successful in founding and leading a national shelf-chartered bank in the United States.   As a result of the conduct of Weinger and others, it is likely that the Plaintiffs will never again have the opportunity to obtain a shelf-charter or to participate in banking at the same levels which they enjoyed at CertusBank.

152.    The Plaintiffs suffered further special damage in that they were forced to engage lawyers and incur legal expense in an effort to regain rights which were wrongfully taken from them and to restore reputations that were wrongfully destroyed.

153.    The Plaintiffs are entitled to and pray for an award of damages against the Defendants herein both for actual damages, in an amount necessary to compensate the Plaintiffs fully for all losses occasioned herein, and punitive damages, in an amount deemed sufficient by a jury to compensate the Plaintiffs to impress upon the Defendants the seriousness of their conduct and to deter such similar conduct in the future.

WHEREFORE, Plaintiffs pray for and request the following:

1.    Judgment against all the Defendants, jointly and severally for actual damages, in an amount to be determined by the jury, which is fair, just and reasonable, and which will completely and lawfully compensate the Plaintiffs for any and all damages proximately caused by the tortious conduct; and

2.    That this Honorable Jury inquire into the facts and circumstances surrounding this matter and determine whether or not punitive damages are appropriate and if punitive damages

are appropriate, then to award punitive damages in an amount which will be in accordance with the law and evidence in this case, together with attorneys' fees and costs.

**BLAND RICHTER, LLP**
*Attorneys for Plaintiff*


*s/Eric S. Bland*
Eric S. Bland (Fed. Bar No. 64132)
1500 Calhoun Street
Post Office Box 72
Columbia, South Carolina 29202
803.256.9664 (telephone)
803.256.3056 (facsimile)
ericbland@blandrichter.com (e-mail)

*s/Ronald L. Richter, Jr.*
Ronald L. Richter, Jr. (Fed. Bar No. 66377)
*s/Scott M. Mongillo*
Scott M. Mongillo (Fed. Bar No. 7436)
Peoples Building
18 Broad Street, Mezzanine
Charleston, South Carolina 29401
843.573.9900 (telephone)
843.573.0200 (facsimile)
ronnie@blandrichter.com (e-mail)


**Richard A. Harpootlian, PA**
*Attorneys for the Plaintiffs*

*s/Richard A. Harpootlian*
Richard A. Harpootlian (Fed. Bar No. 1730)
1410 Laurel Street
Post Office Box 1090
Columbia, South Carolina 29202
803.252.4848 (telephone)
803.252.4810 (facsimile)
rah@harpootlianlaw.com (email)


Columbia, South Carolina

April 23, 2014